IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JACQUELINE B. BLICKLE, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 12 C 9795 |
| Plaintiff, | | Judge Virginia M. Kendall |
| v. | | |
| ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Jacqueline Blickle filed this action against the Illinois Department of Children and Family Services ("DCFS") alleging that DCFS violated the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Age and Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. On June 7, 2013, this Court dismissed Blickle's claims under the ADEA, as well as her hostile work environment claim under the ADA. Blickle has three remaining claims under the ADA for failure to accommodate, constructive discharge, and retaliation. The parties have filed cross-motions for summary judgment on all three claims. For the following reasons, the Court grants DCFS' motion for summary judgment [55] and denies Blickle's motion for summary judgment [64].

**I. BACKGROUND**

Plaintiff Jacqueline Blickle worked with DCFS as a Child Welfare Nurse Specialist from July 1995 until November 2010. (Dkt. No. 80, Pl. 56 Resp. at ¶ 4). Blickle was 70-years old at the time she stopped working with DCFS. (*Id.*) As a Nurse Specialist, Blickle's responsibilities included fielding referrals from DCFS employees and contractors and providing consultations

1

when a child in DCFS' care needed a medical assessment. (*Id*. at ¶ 6). Unless they are approved to work offsite, Nurse Specialists are expected to report to their "home office" every morning at 8:30 a.m. (*Id*. at ¶ 8). In addition to their "home office," Nurse Specialists are also required to visit other DCFS offices on a regular basis. (*Id*. at ¶ 10).

At all relevant times, Blickle's "home office" was in Aurora, Illinois, which was 13 miles from her residence. (*Id*. at ¶¶ 14, 79). In 2008 and 2009, Blickle informally asked Jane Kelly—one of her two supervisors[1]—whether she could transfer her "home office" to the Glen Ellyn Field Office. (*Id*. at ¶ 15). Kelly denied the requests, though she informally allowed Blickle to work from the Glen Ellyn Field Office often because Kelly thought the office was closer to Blickle's residence. (*Id*. at ¶ 16).

### A. Alleged Disability

At her deposition, Blickle testified that her back condition in 2010 caused her to experience pain while walking and standing. (*Id*. at ¶ 28). She said, however, that the back pain did not interfere with her ability to perform her job duties and that she was able to complete all of her job responsibilities when she was at work though she could not stand for more than ten minutes at a time or walk more than 75 feet without having to sit down. (*Id*. at ¶ 30). Blickle also testified that her back pain did not interfere with her ability to perform the travel required for her job and that she was able to "drive for indefinite periods of time and that she would stop and take breaks if it was a long trip." (*Id*. at ¶ 31).

Blickle's doctor, Dr. Kevin Walsh, testified at his deposition that Blickle never mentioned to him that she had trouble attending physical therapy because of her work location. (*Id*. at ¶ 35). Nor did she tell him that she had trouble travelling to her work location. (*Id*. at ¶ 34). A March 30, 2010 letter from Dr. Walsh stated—among other things—that Blickle "would

---

[1] Blickle also reported to DCFS Chief Nurse Jerrilyn Pearson-Minor. (Dkt. No. 80, at ¶ 11).

not be advised to take a position where she would have to travel long distances in a car" and that she would be "likely to have increased pain after prolonged sitting and certainly after driving long distances." (*Id*. at ¶ 36).

### B. Accommodation Request

In late 2009 to early 2010, DCFS began to consider closing several offices and consolidating its clinical staff at one location. (*Id.* at ¶ 17). DCFS specifically contemplated moving the clinical employees staffed at the Aurora office to the Elgin office. (*Id.*). Blickle informed Kelly that she did not want to transfer to the Elgin office because it was further away from her home. (*Id.* at ¶ 18). On March 25, 2010, Blickle submitted a written request for reasonable accommodation to DCFS. (*Id*. at ¶ 19). Blickle wrote that she "[w]as recently asked to relocate from Aurora to Elgin Field Office (27 miles from residence); due to validated chronic medical issue time in travel aggravates condition, asking to relocate to Glen Ellyn field office (7 miles from residence) currently finding difficulty with drive to Aurora (18 miles)[2]." (*Id*. at ¶ 20). She described her disability as "spinal stenosis, osteoarthritis." (*Id*. at ¶ 21). Blickle explained that the request would "enable [her] to have less time in travel status/thereby lessening the stress on [her] back (spinal stenosis/osteoarthritis issue)" and that it would allow her to "get to Edward Hospital Therapy Pool more often for pain relief." (*Id*. at ¶¶ 22-23). Blickle noted on her request that there were no other acceptable alternatives for accommodation. (*Id*. at ¶ 24).

When Edgar Hernandez—the Administrator of Social Work Practice and Interim Associate Deputy Director of the Clinical Division for DCFS in 2010—received Blickle's request, he consulted with another DCFS representative, Pete Wessel. (*Id*. at ¶ 40). Blickle's two direct supervisors, Kelly and Pearson-Minor, met with Blickle in April 2010 to request more

---

[2] Blickle clarified at her deposition that the Aurora office was thirteen, not eighteen, miles from her home. (Dkt. No. 80, at ¶ 27).

3

information regarding her accommodation request. (*Id*. at ¶ 41). Blickle did not say much during that meeting. (*Id*. at ¶ 42). Following the meeting, one of Blickle's supervisors sent her an email on April 15, 2010 requesting additional information, including Dr. Walsh's definition of "long distances." (*Id*. at ¶ 43). On May 19, 2010, Pearson-Minor sent Blickle an email advising that they had not received clarification from Dr. Walsh and requested a status update. (*Id*. at ¶ 45). Blickle never responded. (*Id*. at ¶ 46). Eventually, on June 24, 2010, Blickle's supervisors and Hernandez recommended denying Blickle's request for accommodation because of the lack of additional information. (*Id*. at ¶ 50).

On August 30, 2010, in response to a DCFS request for clarification, Dr. Walsh wrote that Blickle "is not likely to be able to sit for more than an hour. She would have to get up and walk around at least once an hour. It would take 10 minutes for her to recover following sitting for one hour. Similarly, the patient cannot drive for more than an hour at a time. She would have to stop and get out of the car and walk around. Long driving without interruption would be difficult for this patient. Again, it would take 10 minutes to recover for every one hour of driving." (*Id*. at ¶ 53). DCFS employees, including Blickle, are allowed to take 10-minute breaks from sitting or driving. (*Id*. at ¶ 55).

On September 2, 2010, one of Blickle's supervisors sent her an email explaining that DCFS was trying to figure out what could be done for her and offered her a lumbar support for her car. (*Id*. at ¶ 56). On September 29, 2010, the supervisor again offered lumbar support. Blickle responded that she would check with her surgeon, but never responded beyond that. (*Id*. at ¶¶ 58-60).

On September 8, 2010, Blickle sent an email to her supervisor requesting to work at the Glen Ellyn office so she could use the therapy pool which was unavailable after 6 p.m. (*Id*. at ¶

4

67). Blickle's use of the therapy pool was not ordered by her doctor and was not overseen by a doctor or therapist. (*Id*. at ¶ 68-69). Blickle did not need to use that one particular therapy pool and never attempted to find an alternative therapy pool, though alternatives did exist. (*Id*. at ¶¶ 71-73).

### C. Subsequent Employment

In the fall of 2010, Blickle took a leave of absence because her back pain was so severe she could not work. (*Id*. at ¶ 64). She returned to work in mid-October 2010 and resumed her job duties without any restrictions from her doctor. (*Id*. at ¶ 65). Blickle testified that she believed DCFS retaliated against her after she filed her request for retaliation because her supervisor verbally admonished Blickle about talking too loud and disturbing others and asked Blickle if she was using her personal computer on company time. (*Id*. at ¶ 66). However, Blickle's supervisors did not issue a written reprimand for either incident. (*Id.*) Blickle also testified that Hernandez "threatened Blickle's job shortly after she submitted the request." (*Id.*)

In April 2010, Blickle sent an email requesting information about her retirement benefits. (*Id*. at ¶ 74). She notified DCFS of her intent to retire on October 13, 2010. (*Id*. at ¶ 75).

### II. STANDARD OF REVIEW

On cross-motions for summary judgment, each movant must satisfy the requirements of Rule 56 of the Federal Rule of Civil Procedure. *See Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See*

5

*Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (" 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.' ").

### III. DISCUSSION

#### A. ADA Failure to Accommodate

Blickle claims DCFS violated the ADA by failing to provide her with a reasonable accommodation for her disability. *See* 42 U.S.C. § 12101, *et seq*. To maintain a failure to accommodate cause of action under the ADA, a plaintiff must show that: (1) she is a "qualified individual with a disability"; (2) the defendant knew of the disability; and (3) the defendant failed to reasonably accommodate her disability. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 678 (7th Cir. 2010). In this case, DCFS concedes the first and second elements of Blickle's failure to accommodate claim, disputing only whether it failed to provide reasonable accommodation. (*See* Dkt. No. 57, at 3).

The issue of "whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential*

*Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). Reasonable accommodations may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). "Whether the requested accommodation is necessary requires a showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Oconomowoc Residential Programs*, 300 F.3d at 784 (citation and internal quotation marks omitted). Ultimately, Blickle's claim fails as a matter of law because the only accommodation she requested was not reasonable under the specific facts and circumstances of this case.

The only accommodation that Blickle requested was to be transferred to the Glen Ellyn Field Office (7 miles from Blickle's house) from the Aurora Field Office (13 miles from Blickle's house). She requested this transfer because the shorter commute would put less stress on her back and would allow her to travel to her therapy pool in time to exercise. There are a number of fatal problems with these proffered justifications for her request.

First, Blickle conceded that she was capable of performing the essential functions of her job without an accommodation. Although the Seventh Circuit has yet to address whether a disabled person who can perform all essential functions of a job without any accommodation may still be entitled to a reasonable accommodation, the federal regulations suggest that reassignment is not necessary unless an employee "becomes unable to perform the essential functions of his or her position." *See Rauen v. United States Tobacco Mfg.*, 319 F.3d 891, 897

7

(7th Cir. 2003); *see also* 29 C.F.R. § 1614.203(g) ("When a nonprobationary employee becomes unable to perform the essential functions of his or her position ... an agency shall offer to reassign the individual to a funded vacant position ... unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program."); *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) ("Reasonable accommodations are modifications or adjustments to the work environment . . . that enable a qualified individual with a disability . . . to perform the essential functions of that position.") (citation, internal quotation marks, and alterations omitted). Blickle consistently maintained that, despite her back pain being aggravated by driving long distances, she was able to perform her job. (Dkt. No. 80, Pl. 56 Resp. at ¶ 30). She testified during her deposition that she was able to do all the driving required by her job when she was housed in the Aurora Field Office and she was never moved from the Aurora Field Office. (*Id.* at ¶¶ 31, 79). While Blickle may have preferred a shorter commute, the record does not demonstrate that one was necessary for her to fulfill her employment obligations.

Second, employers are not required to provide accommodations for an employee's commute to work. *See, e.g., Filar v. Chicago Sch. Reform Bd. of Tr*, No. 04 C 4679, 2007 WL 79290, at *6 (N.D. Ill. Jan.5, 2007) ("activities that fall outside the scope of employment, such as commuting to and from a job location[, are] outside the responsibility of the employer under the ADA."), *reversed on other grounds*, 526 F.3d 1054; *Cruz v. Perry*, No. 01 C 5746, 2003 WL 1719995, at *5 (N.D. Ill. Mar. 31, 2003) ("the length of [plaintiff's] commute is the result of her choice to live in the suburbs, rather than the result of any disabling condition."); *Bull v. Coyner*, No. 98 C 7583, 2000 WL 224807, at *7 (N.D. Ill. Feb. 23, 2000) ("Activities that fall outside the scope of the job, like commuting to and from the workplace, are not within the province of an

employer's obligation under the ADA."). And, even if they were required to provide such accommodation, employers are only required to provide reasonable accommodations that are medically necessary. *Esktrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009). In this case, neither the shorter commute time, nor exercises in the therapy pool were medically necessary.

Blickle concedes that the therapy pool was not recommended by a doctor and the only evidence offered in support of her request for shorter commute time was a letter from her doctor stating that Blickle generally "would not be advised to take a position where she would have to travel long distances in a car" and that she would be "likely to have increased pain after prolonged sitting and certainly after driving long distances." (Dkt. No. 80, Pl. 56 Resp. at ¶ 36); *see Esktrand*, 583 F.3d at 976 (disabled employees must provide "corroborating evidence such as a doctor's note . . . before an employer may be required . . . to provide a specific modest accommodation"). Upon receiving this information, Blickle's supervisors repeatedly asked for clarification as to what qualified as "long distances." Eventually, the doctor clarified that Blickle "cannot drive for more than an hour at a time." There is no evidence in the record indicating that Blickle's 13-mile commute from her residence to the Aurora Field Office was longer than, or even close to, one hour. Based on this record, Blickle has failed to demonstrate that the requested accommodation was medically necessary. *See Esktrand*, 583 F.3d at 976 (no evidence of medical necessity based on employee's own remarks about her medical need); *see also, e.g.*, *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 922 (N.D. Ill. 2013) (no evidence of medical necessity to restrict outside work where plaintiff told employer that she did not want to work outside but only provided a doctor's note generally suggesting light duty).

Finally, Blickle's argument that DCFS failed to engage in the interactive process required under the ADA to develop reasonable accommodations is insufficient to survive a motion for summary judgment. The interactive process required under the ADA is not an end in itself. *See Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) (noting that the interactive process does not give rise to an independent basis of liability under the ADA). To survive a motion for summary judgment, Blickle must demonstrate something more than DCFS failing to engage in an interactive process or causing the interactive process to devolve: she must show "that the result of the inadequate interactive process was the failure of [DCFS] to fulfill its role in 'determining what specific actions must be taken by an employer' in order to provide the qualified individual a reasonable accommodation." *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000), citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996); *see also Basden*, 714 F.3d at 1039 ("Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation"). In this case, Blickle's supervisors met with her, sent emails attempting to provide her lumbar support and discuss further accommodation, and sought further medical information in an effort to determine a proper accommodation. If anything, Blickle failed to engage the interactive process in this case: she repeatedly failed to respond to emails, provide additional support for her request, or follow up in any meaningful way. Because Blickle has failed to demonstrate that the result of any breakdown in the process resulted in DCFS' failure to provide a reasonable accommodation, there is no genuine issue of material fact on this issue.

### B. ADA Constructive Discharge

Constructive discharge occurs where "an employee resigns or retires from employment, but the resignation or retirement was not truly voluntary." *Wright v. Ill. Dept. of Children and Family Serv.*, Case Nos. 13-1552 and 13-1553, 2015 WL 4863400, at *9 (7th Cir. Aug. 14, 2015). A constructive discharge may occur in either of two ways:

> The first is when an employer makes the working condition sufficiently intolerable so that a reasonable person standing in the position of the employee would have resigned or retired.
>
> The second is when, at the time the employee resigns or retires, the employee reasonably believes that, had he not resigned or retired, he would have been immediately fired. (*Id*. at *8-9).

Both methods, however, require the plaintiff to show that her "working conditions had become intolerable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). In support of her constructive discharge claim, Blickle argues that she was constructively discharged "as a result of disability discrimination under the ADA." (*See* Dkt. No. 79, at 18). Specifically, Blickle asserts that her supervisor verbally admonished her for talking too loud and disturbing others, and asked Blickle whether she was using her personal computer on company time; and that Hernandez entered her cubicle about two weeks after she made her accommodation request and "threw the document that [she] had prepared on [her] desk and said, Looks like you are too sick to work. I have to – I'll have to talk to labor management." (Dkt. No. 69-1, at 46).

Taking into account these assertions and drawing all reasonable inferences in favor of Blickle, the Court concludes that her constructive discharge claim fails for two reasons. First, Blickle has not shown that the conditions of her employment even begin to approach the intolerable levels required in a constructive discharge case. *See Holyfield-Cooper v. Bd. of Ed. of the City of Chicago*, 604 F. App'x 504, 508 (7th Cir. 2015), citing *Chapin,* 621 F.at 679 (stating

11

that work environment must be unendurable to support a constructive discharge claim); *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (noting that work environment must be objectively and subjectively hostile and abusive to support claim of harassment). An allegedly thrown piece of paper, unwelcome admonishments, other brief incidents with work colleagues, even a threat, do not create an intolerable work environment contemplated by the constructive discharge context. *See Chapin*, 621 F.3d at 679 ("One threat and raised voices would not rise to the level of a hostile work environment, and so it also cannot be the basis for Chapin's constructive discharge claim."); *Ekstrand*, 583 F.3d at 978 (finding no constructive discharge where teacher was not given her requested classroom, was required to provide more precise estimate of leave time, and was required to turn in keys and ID once she decided not to return for the school year); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (finding constructive discharge where the employee's boss consistently made racial comments and on one occasion held a gun to his head, took a photo, and later showed it at a staff meeting while making racial jokes).

Second, when asked at her deposition why she retired, Blickle responded: "I made the decision because I thought I had worked long enough, that I wasn't going to fight city hall and I was wanting to leave on good terms." (Dkt. No. 69-1, at 44). Blickle's retirement was, at the very least, partially motivated by her number of years of service. Blickle may not have wanted to deal with management and its refusal to transfer her to Glen Ellyn, but the inconveniences and common work place frustrations present in this case are simply not sufficient to support a constructive discharge claim. Judgment is entered in favor of DCFS on this claim.

### C. ADA Retaliation

Under the ADA, employers may not retaliate against employees who assert their right under the act to be free from discrimination. 42 U.S.C. § 12203(a); *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). A retaliation plaintiff may prove her case under either a direct or indirect method of proof. *Dickerson*, 657 F.3d at 601. Under both methods, however, she must show that she suffered an adverse employment action: an element Blickle has failed to satisfy. *See id*. Blickle maintains that the adverse employment action in this case is that she was constructively discharged. Constructive discharge does constitute an adverse employment action in a retaliation claim brought under the ADA. *See Chapin*, 621 F.3d at 679. However, because there was no constructive discharge in this case for the reasons stated above, there was also no adverse employment action under Blickle's retaliation theory.[3] *See Chapin*, 621 F.3d at 681 (Finding no adverse action under retaliation theory where no constructive discharge) *see also* Dkt. No. 79, at 21 ("For the same reasons Defendant's summary judgment Motion should be denied as to Blickle's constructive discharge claim, so too should Defendant's Motion be denied as to Blickle's retaliation claim…"); Dkt. No. 84, at 8 ("[T]he retaliation that is the subject of Blickle's claim is the constructive discharge discussed above, not the threat [from Hernandez's behavior in Blickle's cubicle], though that is of course a part of the story."). Judgment is, therefore, entered in favor of DCFS on this claim as well.

---

[3] A plaintiff can argue that a threat of termination had the impact of dissuading a reasonable worker from supporting a discrimination complaint, which might act as the necessary adverse action underlying her retaliation claim. *See, e.g., Chapin*, 621 F.3d at 681 n.2, *citing Pantoja v. Am. NTN Bearing Mfg.*, 495 F.3d 840, 849 (7th Cir. 2007); *Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 624 (7th Cir. 2002); *but see Dunn v. Washington County Hosp.*, 429 F.3d 689, 690 (7th Cir. 2005) (stating that one unfulfilled threat could not be actionable and finding that "nasty" requests to withdraw a complaint did not cause injury). However, neither party explored this possibility and this Court declines to do so as well. *See Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 1005 (7th Cir. 2003).

## **CONCLUSION**

For the foregoing reasons, this Court grants DCFS' motion for summary judgment [55] and denies Blickle's motion for summary judgment [64].

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 9/28/2015